## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

Daniel Saldivar, Michael Wolfe, Zurrell    )
Hernandez, Christopher Hicks, Ronnie Smith  )
II, Larry Pruitt, Robert D. Johnson        )
                               )
        Plaintiff,               )
                               )
vs.                               )
                               )
Oklahoma Department of Corrections,    )   Case No.: CIV-24-442-PRW
Steven Harpe, Director, Oklahoma        )   (Removed from Oklahoma County
Department of Corrections, in his official and )   District Court Case No: CJ-2024-2320)
individual capacities; John/Jane Doe I, II, III, )
IV, (Employees/Agents of GPCC/DOC), in  )
their official and individual capacities;     )
John/Jane Doe V, VI, (Shift Supervisors and )
Administrators of GPCC), in their official   )
and individual capacities,            )
                               )
        Defendants.        )

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT

**NOW INTO COURT COME** the Plaintiffs, by and through their attorneys of record,

Richard C. Labarthe and Alexey V. Tarasov, and hereby respond to the Defendants' Motion to

Dismiss as follows:

### STATEMENT OF THE CASE

This case arises from the grievous and unlawful treatment endured by the Plaintiffs

Daniel Saldivar, Michael Wolfe, Zurrell Hernandez, Christopher Hicks, Ronnie Smith II, Larry

Pruitt, and Robert D. Johnson while confined within the Great Plains Correctional Center

("GPCC"). *See* Pet. at ¶1. The Plaintiffs, all inmates under the custody of the Oklahoma

Department of Corrections ("DOC"), were subjected to inhumane conditions and systemic

neglect by the staff and administration of GPCC and DOC. *Id.* Each of their stories are summarized below.[1]

In August 2023, Daniel Saldivar was confined in a 3' x 3' shower cell for days, a space devoid of basic human dignities, leading him to attempt suicide as a cry for help. *See* Pet. at ¶¶2-4. The shower cell, filled with human feces, became his abode for three days and four nights, exacerbating his despair and highlighting the cruel and unusual punishment inflicted upon him. *See* Pet. at ¶¶3, 27-33. The staff at GPCC, including unnamed employees and supervisors, exhibited deliberate and reckless indifference to Saldivar's plight, failing to take meaningful action to alleviate his suffering. *See* Pet. at ¶¶4, 5, 27, 28, 29, 30.

Similar distressing experiences were faced by other Plaintiffs, each bearing his own harrowing tale of dehumanizing treatment. Michael Wolfe, a Native American serving a life sentence, was locked in the shower four times, exacerbating his mental and physical suffering. *See* Pet. at ¶¶10, 37-39. Zurrell Hernandez, another Hispanic inmate, was physically abused and confined in the shower without basic necessities, further illustrating the systemic issues at GPCC. *See* Pet. at ¶¶11, 40-42.

Christopher Hicks, a stabbing victim, endured neglect and inadequate food provision during his 36-hour confinement in a shower stall. *See* Pet. at ¶¶12, 43, 44. Ronnie Smith II, a former Marine, faced extreme punitive measures and was confined in a 2' x 2' space for 42 hours due to a conflict with another inmate. *See* Pet. at ¶¶13, 45, 46. Larry Pruitt,[2] serving a life sentence, experienced severe mistreatment, including weeks without basic necessities and confinement in a shower stall. *See* Pet. at ¶¶14, 47-50.

---

[1] Plaintiff Robert D. Johnson has been dismissed and this response does not address any claims pertaining to him.

[2] Mr. Pruitt is an African American.

The use of shower stalls for prolonged confinement, a systematic practice at GPCC, starkly violated human rights standards and reflects a broad institutional failure by DOC to uphold inmates' dignity and safety. Pet. at ¶¶55-56. Some staff members saw these conditions as violations and attempted to address them but faced internal conflict and intimidation from higher authorities when they did so. *See* Pet. at ¶¶57, 58. Despite reports and concerns raised by staff, decisive action and clear policy guidance remained elusive. *See* Pet. at ¶59.

An investigation initiated by DOC's Inspector General highlights the widespread nature of these inhumane practices and the systemic issues within the GPCC facility. *See* Pet. at ¶¶60-72. The investigation underscored the need for policy review and revision, greater oversight, and adherence to human rights standards in the treatment of inmates. *See* Pet. at ¶¶69-73.

The Plaintiffs bring this action seeking justice and redress for the severe emotional distress, physical discomfort, and degradation of personal dignity they endured due to the Defendants' actions and inaction. *See* Pet. at ¶¶74-100. They request declaratory and injunctive relief to prevent future violations and ensure the humane treatment of all inmates at GPCC.

## <u>ARGUMENT</u>

## I.    THE PLAINTIFFS STATE A VALID CLAIM AGAINST DEFENDANT HARPE IN HIS INDIVIDUAL CAPACITY.

The Plaintiffs have adequately stated a claim against Defendant Harpe in his individual capacity, providing sufficient factual detail to support their allegations. The Defendants argue that the Plaintiffs have not sufficiently stated a claim against Defendant Harpe in his individual capacity, citing a lack of detailed factual allegations. They assert that the Complaints' allegations are too conclusory and do not specify dates or incidents, referencing cases such as *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See* Motion to Dismiss, pp. 3-6. The Defendants rely on *Twombly* and *Iqbal* to argue that the Plaintiffs'

allegations are insufficiently detailed. However, the Plaintiffs' complaint (technically, a Petition, as denominated in state court prior to removal) adequately details specific instances of constitutional violations, including the prolonged confinement in shower stalls and other mistreatment that occurred under Defendant Harpe's supervision, as well as the approximate timeframe of when those violations happened.

## A. The Plaintiffs' Complaint Details Specific Instances of Constitutional Violations by Harpe.

The Petition alleges with specificity that Director Harpe, as the head of DOC, had oversight and ultimate responsibility for the operations and policies of all state correctional facilities, including GPCC. *See* Pet. at ¶16. Despite this responsibility, Harpe failed to implement and enforce policies to prevent inhumane conditions and ensure the humane treatment of inmates. *See* Pet. at ¶¶77-78. This failure allowed the systemic use of shower stalls for prolonged confinement without basic amenities, such as proper sanitation, bedding, and drinking water, resulting in cruel and unusual punishment. *See* Pet. at ¶¶27-33, 56-57. The Petition further asserts that Harpe was aware or should have been aware of these conditions but exhibited deliberate indifference by not taking corrective action. *See* Pet. at ¶¶77, 83. Harpe's inaction, despite knowing the significant risks posed by these conditions, directly contributed to the Plaintiffs' suffering and violation of their Eighth Amendment rights. *See* Pet. at ¶¶78-79.

The allegations in the complaint are not merely conclusory but provide a detailed account of the inhumane conditions and systemic neglect endured by Plaintiffs at the GPCC. Plaintiffs have alleged that Harpe, as the head of DOC, had oversight and ultimate responsibility for the operations and policies of all state correctional facilities, including GPCC. This responsibility includes a duty to provide medical care and ensure the proper management of the prison and the proper conduct of its personnel. *Cf. Estate of Crowell v. Bd. of Cnty. Comm'rs*, 2010 OK 5, ¶31,

237 P.3d 134, 144 (quoting *Anthony v. Baker*, 767 F.2d 657, 666 (10th Cir. 1985)). Plaintiffs have further alleged that Harpe failed to implement and enforce policies to prevent inhumane conditions and ensure the humane treatment of inmates. This failure allowed the systemic use of shower stalls for prolonged confinement without basic amenities, such as proper sanitation, bedding and drinking water, resulting in cruel and unusual punishment. Moreover, the Plaintiffs have asserted that Harpe was aware or should have been aware of these conditions but exhibited deliberate indifference by not taking corrective action. *See* Pet. at ¶¶77, 83.

While cases based on deliberate indifference may require something more than negligence, they require less of a showing than conduct undertaken for the very purpose of causing harm. *Payne v. Kerns*, 2020 OK 31, ¶22, 467 P.3d 659, 668. It is a state of mind more blameworthy than negligence and requires more than ordinary lack of due care for a prisoner's interests or safety. *Id.* Harpe's actions and/or inaction, despite knowing the significant risks posed by the conditions at the GPCC, directly contributed to the Plaintiffs' suffering and to the violation of their Eighth Amendment rights.

## B. High-Ranking Officials Can Be Held Individually Liable for Constitutional Violations.

Under Section 1983, a government official can be held personally liable for constitutional violations if he or she was personally involved in the violation or if his or her actions or omissions were causally connected to the violation. *Martinez v. Dretke*, No. 5:04-CV-306-C, 2006 U.S. Dist. LEXIS 110338, at *15 (N.D. Tex. Nov. 1, 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). Oklahoma courts have said that while a public official acting within the scope of his official duties may be relieved from individual liability for tortious conduct, individual responsibility attaches when the official's acts were *ultra vires*, or outside the scope of employment. *See Pellegrino v. Cameron*

*Univ. ex rel. Bd. of Regents*, 2003 OK 2, ¶14, 63 P.3d 535, 539 (discussing personal liability within the context of the Oklahoma Governmental Tort Claims Act, GTCA, (51 O.S. 2001 §§ 151 *et seq.*)). In this case, Defendant Harpe, as the Director of DOC, acted wrongfully, such that his conduct transcended the bounds of his authorized duties in that he exhibited a deliberate indifference to the constitutional rights of the Plaintiffs. The Court should hold Director Harpe individually liable for the resulting harm.[3]

The fact that Mr. Harpe is the head of DOC does not give him immunity from a 1983 lawsuit. The Supreme Court has found no such immunity for the acts of the governor of a state, the senior and subordinate officers of a state's National Guard, or the president of a state university. *See Scheuer v. Rhodes*, 416 U.S. 232, 247-248 (1974). Case law has thus established that high-ranking state officials can be held individually liable for constitutional violations.

The factual context alleged in the Petition meets the standards established in *Twombly*, *supra*, and *Iqbal*, *supra*. The allegations indicate a pattern of misconduct implicating Harpe's direct involvement and his deliberate indifference, thereby meeting the requirement for personal liability under 42 U.S.C. § 1983. In conclusion, the Plaintiffs have sufficiently stated a claim against Defendant Harpe in his individual capacity, providing detailed factual allegations that meet the "plausibility" legal standard governing dismissal on the pleadings in federal court. *Iqbal*, 556 U.S. at 678 (2009).

## II.   THE PLAINTIFFS ADEQUATELY STATE A CLAIM FOR SUPERVISORY LIABILITY.

The Plaintiffs have sufficiently established a claim for supervisory liability by demonstrating that Defendant Harpe was aware of and failed to address constitutional violations

---

[3] The undersigned would assert on information and belief that DOC acted recklessly at the highest levels in forging ahead in the summer of 2023 with the opening of the GPCC facility and its decision to transfer a great number of inmates there, with inmate population levels significantly in excess of the facility's capabilities. This information is bound to be substantiated in discovery.

occurring under his supervision. The Defendants maintain that the Plaintiffs have failed to

establish a claim for supervisory liability because the complaint does not demonstrate Defendant

Harpe's personal participation in the alleged constitutional violations. They argue that § 1983

does not allow for vicarious liability. *See* Motion to Dismiss, pp. 6-7. The Defendants cite *Foote*

*v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997), *Grimsley v. Mackay*, 93 F.3d 676 (10th Cir. 1996),

and *Bennet v. Passic*, 545 F.2d 1260 (10th Cir. 1976), to support their argument against

supervisory liability. These cases are inapposite, as will be shown below.

## A. The Plaintiffs' Allegations Demonstrate Harpe's Direct Responsibility for Systemic Conditions.

Unlike Foote, who sued the officer that stopped her vehicle alongside the officer's

supervisor having no direct involvement in the alleged misconduct whatsoever, the Plaintiffs

here allege that Defendant Harpe, as the Director of DOC, exhibited deliberate indifference by

failing to implement and enforce policies to prevent inhumane conditions, directly impacting the

Plaintiffs. *See* Pet. at ¶¶16, 27-33. Harpe's failure to act in the face of known risks is not a case

of simple non-involvement but of direct responsibility for systemic conditions that violated

constitutional rights.

The factual findings in *Grimsley*, 93 F.3d at 676 (1996), indicated that the administrators

involved were not present at the facility during the incident, had no supervision over the officers

involved at the time, and had only historical involvement in training programs. *Id.* Specifically,

one of the administrators had ceased working at the prison facility a year before the incident and

was not involved in supervisory or training responsibilities when the injury occurred. *Id.* The

court concluded that the administrators' past responsibility for training did not equate to personal

or supervisory liability for the specific incident. *Id.* In contrast, the Plaintiffs in the current case

specifically allege that Harpe was aware or should have been aware of the unconstitutional

conditions due to his role and responsibilities. *See* Pet. at ¶¶16, 77-78. Harpe's ongoing failure to address and correct the conditions at GPCC directly implicates him in the systemic use of unsanitary and unsafe confinement conditions, demonstrating his deliberate indifference. This direct responsibility for ongoing conditions at the facility, rather than historical involvement or indirect oversight, differentiates Harpe's situation from that of the administrators in *Grimsley*.

In *Bennet*, 545 F.2d 1260 (1976), the issue was whether officials could be held liable without evidence of direct involvement or knowledge of the alleged unconstitutional acts. The court denied a convicted murderer's, *i.e.*, Bennet's, request to proceed *in forma pauperis* because there was no direct evidence connecting the official named in the complaint to any specific misconduct. In the matter at hand, the Plaintiffs have provided detailed allegations that Harpe's failure to establish and enforce appropriate policies and his knowledge of the conditions at the GPCC led to the Plaintiffs' suffering. *See* Pet. at ¶¶27-33, 56-57, 77-78. The claim against Harpe is not based on vicarious liability but on his direct role and failure to prevent known risks, meeting the standards for supervisory liability under § 1983.

In the Tenth Circuit, to establish a claim for supervisory liability under Section 1983, plaintiffs must satisfy three elements: (1) personal involvement, (2) causation, and (3) state of mind. *Jackson v. City of Lawton*, No. CIV-23-284-G, 2023 U.S. Dist. LEXIS 236436, at *10 (W.D. Okla. Dec. 29, 2023) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)). The personal involvement of the supervisor can be established through his or her personal participation, exercise of control or direction, or failure to supervise. *Seidel v. Crayton*, No. CIV 15-00925-MV/CG, 2017 U.S. Dist. LEXIS 173144, at *31-32 (D.N.M. Oct. 19, 2017) (citing *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009)). A plaintiff may satisfy the standard for supervisory liability by showing that the defendant-supervisor personally directed the violation or had actual knowledge of the violation and

acquiesced in its continuance. *Heinrich v. City of Casper*, No. 1:11-CV-280-SWS, 2012 U.S. Dist. LEXIS 194604, at *19 (D. Wyo. Aug. 10, 2012) (*Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996)).

Moreover, plaintiffs must demonstrate that supervisors' conduct was causally related to a constitutional infringement by their subordinates. *Kettering v. Harris*, No. 06-cv-01989-CMA-KLM, 2009 U.S. Dist. LEXIS 57623, at *8 (D. Colo. June 18, 2009) (citing *Serna v. Colorado Department of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006)). This means a supervisor's actions or inaction must have directly led to the violation of a plaintiff's constitutional rights. *Id.* In addition, the supervisor's state of mind is a crucial element in establishing supervisory liability. *Prejean v. Corr. Healthcare Cos.*, No. 13-CV-111-JED-FHM, 2015 U.S. Dist. LEXIS 19166, at *14 (N.D. Okla. Feb. 18, 2015) (citing *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999)). While mere negligence is insufficient to establish supervisory liability, *id.*, a supervisor will be liable if he has acted with deliberate indifference to the rights of a plaintiff. *Id.* Furthermore, a plaintiff may prove these elements with respect to two types of supervisory conduct: a deficient policy or custom, or deficient training. *Jackson v. City of Lawton*, No. CIV-23-284-G, 2023 U.S. Dist. LEXIS 236436, at *10 (W.D. Okla. Dec. 29, 2023) (citing *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019), and *McCarty v. Gilchrist*, 646 F.3d 1281, 1288 (10th Cir. 2011)).

## B. Harpe's Direct Role and Inaction Demonstrate Supervisory Liability.

The Petition here outlines numerous allegations against Director Harpe, highlighting his supervisory liability for the unconstitutional conditions at the GPCC. As DOC Director, Harpe holds ultimate responsibility for the operations and policies of all state correctional facilities, including the GPCC. *See* Pet. at ¶16. Despite this significant oversight role, Harpe is accused of failing to implement and enforce policies that would prevent inhumane conditions, thereby

- 9 -

exhibiting deliberate indifference to the rights and welfare of the inmates. Harpe's liability is further established by his alleged knowledge of these inhumane conditions and his failure to take corrective action. The Petition asserts that Harpe was aware or should have been aware of the unconstitutional conditions due to his role and responsibilities. *See* Pet. at ¶¶16, 77-78. Harpe's deliberate indifference to the known risks posed by these conditions is demonstrated by his inaction and failure to enforce appropriate policies. *See* Pet. at ¶¶27-33, 56-57. Moreover, the systemic use of shower stalls for prolonged confinement without basic amenities, which persisted under Harpe's tenure, underscores his supervisory liability. The Petition alleges that Harpe's inaction directly contributed to the ongoing constitutional violations experienced by the Plaintiffs. *See* Pet. at ¶¶56-57, 77-78. This inaction amounts to a failure to fulfill his duties as Director, thereby meeting the standard for supervisory liability under § 1983.

In conclusion, the complaint provides specific allegations of how Harpe's lack of supervision and the inadequate response to the misconduct of his subordinates led to Plaintiffs' injuries. Consequently, the Plaintiffs *have* adequately stated a claim for supervisory liability.

## III.    THE PLAINTIFFS STATE A CLAIM AGAINST DOC.

The Plaintiffs have sufficiently implicated DOC through the actions and policies enforced by its employees and administrators, warranting prospective injunctive relief. Defendants assert that the Plaintiffs have not stated a claim against DOC, as the complaint does not specifically mention DOC, and the department is protected by Eleventh Amendment immunity. *See* Motion to Dismiss, pp. 7-8. The Defendants rely on cases such as *Eastwood v. Dept. of Corr. of State of Okla.*, 846 F.2d 627 (10th Cir. 1988), *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), and *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002), to argue DOC's immunity. None of these decisions support the Defendants' point. For example, in *Eastwood*, the Tenth Circuit held that the Eleventh Amendment barred a damages action against DOC ***because***

*the state had not consented to be sued in federal court*. *Eastwood*, 846 F.2d at 631. *Garrett*

dealt with the applicability of the Eleventh Amendment to suits for money damages under the

Americans with Disabilities Act (ADA). *Garrett*, 531 U.S. at 360.

## A. DOC Waived Eleventh Amendment Immunity by Removing the Case to Federal Court.

Based on clear-cut and unequivocal legal precedent, DOC indisputably waived Eleventh

Amendment immunity when it voluntarily removed this case from state to federal court. The U.S.

Supreme Court has established that ***when a state voluntarily invokes the jurisdiction of a***

***federal court by removing a case from state court, such an action operates as a waiver of***

***Eleventh Amendment immunity***. *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005)

(citing *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 626 (2002)).

This principle has been upheld in various circuit courts. *See, e.g.*, *Walden v. Nevada*, 945 F.3d

1088, 1090 (9th Cir. 2019); *Lombardo v. Pennsylvania*, 540 F.3d 190, 196 (3d Cir. 2008). The

Tenth Circuit has applied the principle established in *Lapides* to cases involving the removal of

federal claims under § 1983 from state to federal court. This removal "unequivocally invokes the

jurisdiction of the federal courts," thus waiving sovereign immunity. *Warren v. N.M. Corr. Dep't*,

No. 01-1184 LCS/KBM-ACE, 2002 U.S. Dist. LEXIS 30593, at *17 (D.N.M. Dec. 10, 2002)

(citing *Estes v. Wyo. Dept. of Transp.*, 302 F.3d 1200, 1206 (10th Cir. 2002)).

## B. DOC's Systemic Failures and Deliberate Indifference Are Alleged.

Plaintiffs have sufficiently implicated DOC through the actions and policies enforced by

its employees and administrators, warranting prospective injunctive relief.[4] First, as DOC's

Director, Defendant Harpe holds ultimate responsibility for the operations and policies of all

---

[4] One form of injunctive relief the Plaintiffs seek is prospective injunctive relief against DOC, which – even had the Eleventh Amendment immunity applied – would squarely fall within an exception to that Amendment's immunity set out in *Ex Parte Young*, 209 U.S. 123 (1908).

state correctional facilities, including GPCC. *See* Pet. at ¶16. This significant oversight role inherently implicates DOC in the systemic issues addressed by this lawsuit. The Petition details specific instances where Plaintiffs, all in DOC custody, were subjected to prolonged confinement in unsanitary shower stalls, without access to basic amenities such as proper sanitation, bedding and drinking water. *See* Pet., ¶¶27-33. These conditions indicate systemic failures within DOC's operational framework and directly place at issue its policies and standards.

Furthermore, the Petition asserts that DOC failed to establish and enforce appropriate policies to prevent the use of shower stalls for prolonged confinement. *See* Pet. at ¶¶56-57. This failure highlights a broader pattern of constitutional violations facilitated by DOC's deliberate indifference to the rights and welfare of inmates. The allegations of deliberate indifference are supported by the continued use of inhumane confinement practices despite awareness of the conditions. *See* Pet. at ¶¶77-78. The complaint illustrates that the systemic use of shower stalls for confinement and the lack of response to known risks were not isolated incidents but reflective of institutional failures at the policy and enforcement levels.

Additionally, the detailed narrative in the Petition provides specific allegations of administrative oversight failures. For instance, it highlights Harpe's direct involvement in policymaking and enforcement, which connects the actions of individual employees to the broader systemic practices of DOC. *See* Pet. at ¶16. The persistent use of unsanitary confinement conditions and the failure to address these issues despite known risks demonstrate a breach of duty that directly involves DOC. *See* Pet. at ¶¶77-78. Given these allegations, the claim against DOC is well-founded. These issues underscore the need for judicial intervention to ensure that DOC rectifies its policies and practices to comply with constitutional standards, thereby warranting injunctive relief.

## C. Immunity from Liability Is Not at Issue.

Defendants contend that removal of this matter to federal court constitutes only a waiver of immunity from suit and not a waiver of immunity from liability. Defendants cite *Trant v. Oklahoma*, 754 F.3d 1158, 1173 (10th Cir. 2014), for the proposition that a state may waive its immunity from suit in a federal forum while retaining its inherent immunity from liability. Defendants rely on this principle to argue that, despite consenting to removal, DOC maintains its immunity from liability as to monetary damages. However, that immunity is designed to shield a state from liability for damages claims and is determined under state law. Importantly, such immunity from liability does not extend to claims seeking injunctive relief.

In the instant case, at this stage, Plaintiffs are not seeking a monetary damages award or any relief that would subject the state to liability. Rather, Plaintiffs seek narrowly tailored, prospective injunctive relief against DOC and individual DOC officials for ongoing violations of federal law – precisely the sort of claim authorized under the *Ex parte Young*, *infra*, doctrine.

## IV. THE PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 1981.

The Plaintiffs have properly alleged racial discrimination under Section 1981. The Defendants argue that the Plaintiffs have not adequately stated a claim under Section 1981, as they purportedly fail to allege racial discrimination or interference with a contractual relationship. *See* Motion to Dismiss, pp. 8-9. The Defendants cite *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001), to support their argument. The Defendants' reliance on *Hampton* is misplaced. In *Hampton*, the court addressed a private-sector discrimination claim where the plaintiff alleged racial discrimination by a department store, alleging that she was entitled to a free cologne sample. *Id.* at 1098. The court found that the plaintiff failed to present sufficient evidence of discriminatory intent by the store. *Id.* at 1123. *Hampton* is distinguishable from the

case at hand. In *Hampton*, the claim was related to an isolated incident of alleged racial

discrimination in a commercial setting. In contrast, the current case involves systemic and

prolonged discriminatory practices within a state-run correctional facility, where the conditions

and policies affect numerous inmates over an extended period. The plaintiff in *Hampton* failed to

provide adequate evidence of discriminatory intent by the store's employees. Contrary to what

the Defendants maintain, the complaint in this case includes allegations of systemic racial

discrimination, supported by specific instances of mistreatment of minority inmates. The

Plaintiffs have adequately stated a claim under 42 U.S.C. § 1981 for racial discrimination, as the

complaint details instances of discriminatory treatment against minority inmates.

## A. Section 1981 Ensures That All Persons Within the U.S. Are Not Subject to Different "Punishment, Pains, Penalties" Compared to White Citizens.

Section 1981 ensures ***all*** individuals within the jurisdiction of the United States the same

right to make and enforce contracts, sue, and receive the full and equal benefit of all laws

enjoyed by white citizens. Section 1981 provides that:

> **All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.**

> ***See*** **42 U.S.C. § 1981.**

The plain language of §1981's phrase "shall be subject to like punishment, pains,

penalties, taxes, licenses, and exactions of every kind, and to no other" protects the Plaintiffs

from being singled out for disproportionately draconian punishment while in DOC custody.

## B. Specific Instances of Discriminatory Practices and Conditions Are Stated in the Petition.

The Petition illustrates that Plaintiffs, the majority of whom are minorities, were subjected to discriminatory practices and conditions that violated their rights under §1981. Plaintiffs, including Daniel Saldivar, an Hispanic, and other minority inmates, were subjected to prolonged confinement in feces-laden shower stalls without access to basic amenities. *See* Pet. at ¶¶27-33. These conditions were not equally imposed on all inmates at the GPCC, evincing a racial bias in their application and enforcement. Michael Wolfe, a Native American inmate, faced repeated lock-ups in the shower stalls, exacerbating his mental and physical suffering. *See* Pet. at ¶37. Similarly, Zurrell Hernandez, another minority Hispanic inmate, was physically abused, pepper-sprayed, and confined in a shower stall without basic necessities. *See* Pet. at ¶40. Larry Pruitt is an African American. The targeting of these minority inmates indicates a pattern of racial discrimination in their treatment. The systemic practice of using shower stalls for prolonged confinement without basic amenities reflects a policy that disproportionately affects minority inmates. *See* Pet. at ¶¶56-57.

## V.    THE PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

### A. Eleventh Amendment Defense Fails as Immunity Has Been Waived.

The Plaintiffs are entitled to injunctive relief to prevent further violations of their constitutional rights. The Defendants argue that the Plaintiffs are not entitled to injunctive relief because there is no ongoing constitutional violation. *See* Motion to Dismiss, pp. 9-10. The Defendants cite *Green v. Mansour*, 474 U.S. 64 (1985), to support their argument against injunctive relief. In *Green*, the Supreme Court held that the Eleventh Amendment barred retrospective relief, such as compensatory damages or declaratory judgments addressing past violations of federal law.[5] The case focused on the unavailability of retrospective relief against

---

[5] The plaintiffs in *Green* were recipients of welfare benefits who argued that Michigan's Department of Social Services had violated federal law in the past by not calculating their benefits correctly. *Green*, *supra*, at 65. They

state officials for past actions. *Green*, 474 U.S. at 68 (1985). However, this reasoning does not apply to the case at bar. The Eleventh Amendment defense is negated because the state has waived its Eleventh Amendment immunity by removing the case to federal court. The Supreme Court in *Lapides*, 535 U.S. 613, 626 (2002), held that ***a state waives its Eleventh Amendment immunity when it removes a case to federal court***. Therefore, the Defendants cannot rely on *Green* to argue against injunctive relief on the grounds of Eleventh Amendment immunity.

## B. Request for Prospective Injunctive Relief Is Supported by the Petition's Allegations that the Inhumane Confinement Practices Are Systemic.

Defendants argue that to satisfy prospective injunctive relief requirements, the complaint must explicitly allege an ongoing federal violation. In this case, the Petition meets this standard by alleging that the continued enforcement of inhumane confinement practices constitutes such a violation. While elements of an ongoing violation can be inferred from the context of well-developed factual allegations, in this case, the Petition clearly alleges that the "shower cell filled with human feces" became Inmate Saldivar's "abode for three harrowing days and four nights" (Pet. ¶3–4) and that this practice is part of a "systematic approach adopted by the Department of Corrections" (Pet. ¶55–57). As explained in *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002), it is sufficient for a complaint to state in the prayer for relief that if an order continues to be enforced, it will result in a continuing violation of federal law, and as the Tenth Circuit noted in *Buchheit v. Green*, 705 F.3d 1157,

---

wanted the federal court to issue two things: a declaration that Michigan had violated the law in the past and an order requiring Michigan to notify them about these past violations. *Id.* The Court decided that giving a declaration and notice about past violations would be similar to giving retrospective relief against a state. *Id.* at 67. This kind of relief is aimed at addressing past wrongs, and the Eleventh Amendment prevents federal courts from awarding this type of relief against states. *Id.* at 73. Not so in the matter at hand, where Oklahoma effectively waived Eleventh Amendment immunity.

1159 (10th Cir. 2012), this straightforward inquiry confirms that even inferred

allegations can satisfy the requirement for prospective relief.

### C. Prospective Injunctive Relief Is Clearly Available Under *Ex parte Young*.

Assuming, *arguendo*, that *Green* applied, it would still not preclude prospective

injunctive relief aimed at preventing future constitutional violations, as established by *Ex parte*

*Young*, 209 U.S. 123 (1908). *See Green*, 474 U.S. at 68 (citing *Ex parte Young*, 209 U.S. at 155-

156, 159). Moreover, a court retains authority to exercise supervisory power over the matter until

one can say with assurance that the unconstitutional practices have been discontinued and that

there is no reasonable expectation that unconstitutional practices will recur. *Anderson v.*

*Colorado*, No. 10-cv-01005-RBJ-KMT, 2015 U.S. Dist. LEXIS 45258, at *9 (D. Colo. Apr. 7,

2015) (citing *Battle v. Anderson*, 708 F.2d 1523, 1538 (10th Cir. 1983)). The Plaintiffs continue

to suffer from unconstitutional conditions and practices at GPCC and other DOC facilities.

Judicial intervention is necessary to prevent violations of the inmates' constitutional rights. The

complaint demonstrates ongoing harm that justifies the need for injunctive relief. Money

damages alone are not an adequate remedy. Therefore, Plaintiffs are entitled to injunctive relief.

The Defendants' arguments based on the Supreme Court's *Coeur d'Alene* decision to

limit the *Ex parte Young* exception are inapplicable. In *Coeur d'Alene Tribe v. Idaho*, 521 U.S.

261, 287 (1997), the Court considered whether the Tribe could obtain federal relief – specifically,

declaratory and injunctive relief – concerning its purported beneficial interest in the submerged

lands (including parts of Lake Coeur d'Alene and adjacent waterways). The Tribe sought what

amounted to a quiet title action, which would determine state ownership of these lands. While the

Tribe argued that the *Ex parte Young* doctrine should allow it to sue state officials for ongoing

violations of federal law, the Court held that the Ex parte Young exception is narrowly tailored. It

permits only prospective injunctive relief against individual state officials for stopping future or

continuing unlawful acts, not for resolving title issues or transferring core sovereign interests. Because the relief sought in *Coeur d'Alene* would have the effect of divesting the state of its longstanding sovereign control over its public lands and waters, the Court concluded that the suit was barred by the Eleventh Amendment. The Plaintiffs' request here is carefully tailored so as not to disturb any underlying state property rights or sovereign interests. Instead, it serves to enforce federal law against DOC officials whose actions are in violation of that law

## VI. DEFENDANT HARPE IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendant Harpe is not entitled to qualified immunity because the conditions under which Plaintiffs were confined, including lack of bedding and proximity to human feces, clearly violate established constitutional rights. The Defendants assert that Defendant Harpe is entitled to qualified immunity, claiming the Plaintiffs have not shown a violation of clearly established law. *See* Motion to Dismiss, pp. 11-12. The Defendants reference cases such as *Hunter v. Bryant*, 502 U.S. 224 (1991), *Anderson v. Creighton*, 483 U.S. 635 (1987), and *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), to argue for qualified immunity. The rights violated by Defendant Harpe, including those under the Eighth and Fourteenth Amendments, are well-established.

### D. Established Constitutional Rights Violated by Inhumane Conditions.

The Supreme Court in *Wilson v. Seiter*, 501 U.S. 294 (1991), emphasized that conditions of confinement should be examined as a whole because deprivations "in combination" may constitute a constitutional violation. The Court noted that, for example, "a low cell temperature at night combined with a failure to issue blankets" could have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as ... warmth." *Wilson*, 501 U.S. at 304. In evaluating the conditions of confinement, the "'circumstances, nature and duration' of the challenged conditions must be carefully considered." *DeSpain v. Uphoff*, 264

F.3d 965, 974 (10th Cir. 2001) (quoting *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)).

Additionally, the Tenth Circuit has noted that the inquiry into whether alleged deprivations are

sufficiently serious "turns not only on the severity of the alleged deprivations, but also on their

duration." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998).

Plaintiffs have alleged that they were subjected to prolonged confinement in feces-laden

shower stalls without access to basic sanitation or amenities. *See* Pet. at ¶¶3, 27-33. The Tenth

Circuit in *DeSpain* highlighted that "[e]xposure to human waste carries particular weight in the

conditions calculus." *DeSpain*, 264 F.3d at 974. Similarly, in *McBride v. Deer*, the court found

"sufficiently serious" conditions where an inmate was detained in a feces-covered cell for three

days. *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001). Other courts have also been

especially cautious about condoning conditions that include an inmate's proximity to human

waste. *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990); *Michaud v. Sheriff of Essex County*,

390 N.E.2d 523 (Mass. 1983).

The Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994), established that prison

officials are required to provide humane conditions of confinement by ensuring inmates receive

the basic necessities of "adequate food, clothing, shelter, and medical care." *Id.* at 832.

"Exposure to human waste, like few other conditions of confinement, evokes both the health

concerns emphasized in *Farmer* and the more general standards of dignity embodied in the

Eighth Amendment." *DeSpain*, 264 F.3d at 974. The circumstances in this case clearly

demonstrate a violation of the Plaintiffs' Eighth Amendment rights.

### E.  The Facts Pleaded in the Petition Meet the Reasonable Official Standard and Reflect a Violation of Clearly Established Rights.

With reference to Defendant Harpe, the Petition alleges that as the Director of DOC, he

had oversight and ultimate responsibility for the operations and policies of all state correctional

facilities, including GPCC. *See* Pet. at ¶16. Harpe is responsible for the systemic practices that led to the inhumane treatment of the Plaintiffs, including the use of shower stalls for prolonged confinement without basic amenities. *See* Pet. at ¶¶16, 56, 78. The Petition asserts that Harpe's failure to implement and enforce policies that ensure humane conditions, despite his actual or constructive awareness of the problems at issue, constitutes deliberate indifference to the Plaintiffs' rights. *See* Pet. at ¶¶77, 78, 83.

Any reasonable official in Harpe's position would have known that the alleged conduct was unlawful. The Plaintiffs have met their burden of alleging that Harpe's actions violated clearly established rights, thus precluding a qualified immunity defense. Consequently, Defendant Harpe is not entitled to qualified immunity.

## ONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny the Defendants' Motion in its entirety and allow this case to proceed to discovery and trial.

Dated: March 12, 2025.
Respectfully submitted,

Richard C. Labarthe, OBA # 11393

Alexey V. Tarasov, OBA # 32926
LABARTHE & TARASOV, a professional association
Richard C. Labarthe, OBA # 11393
1000 W. Wilshire Blvd., Bldg. 3
Oklahoma City, Oklahoma 73116
(405) 760-3323; (405) 843-9685 Facsimile
richard@labarthelaw.com
330 W. Gray Street, Suite 208
Norman, OK 73069
(405) 410-5631; (832) 558-3540 Facsimile
alexey@tarasovlaw.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. I further certify that a true and correct copy of the foregoing document was sent to the following who are ECF registered participants:

Lauren Ray, OBA# 22694
Lexie P. Norwood, OBA# 31414
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Section
313 NE 21st Street
Oklahoma City, OK 73105
Email: lauren.ray@oag.ok.gov
Email: lexie.norwood@oag.ok.gov
**Attorneys for Defendants**

Alexey V. Tarasov, OBA # 32926
330 W. Gray Street, Suite 208
Norman, OK 73069
(405) 410-5631; (832) 558-3540 Facsimile
alexey@tarasovlaw.com